1          STATE OF MICHIGAN

2    IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

3    DETROIT BOARD OF EDUCATION ADVISORY COUNCIL

4          Plaintiff,

5               Case No. 10 00322 PZ

6    ROBERT BOBB, ET AL

7          Defendant.

8    _____/

9               H E A R I N G

10         PROCEEDINGS HAD  and testimony taken

11   Before the HONORABLE JOHN A. MURPHY,

12   Circuit Judge of the Third Judicial Circuit

13   Court, 921 CAYMC Building, on TUESDAY, MARCH

14   30, 2010.

15   APPEARANCES:

16       ERNEST JARRETT

17       On behalf of the Plaintiff

18       HANS MASSAQUOI and THEOPHILUS CLEMMONS

19       On behalf of the Defendant

20

21   Reporter:  Kathleen Maxwell, CSMR/CSR 0010

22

23

1

2

1

2

3                         Table of Contents

4

5   DETROIT BOARD OF EDUCATION ADVISORY COUNCIL

6   vs. ROBERT BOBB, ET AL

7   10 00322 PZ

8   TUESDAY, MARCH 30, 2010

9

1          1

2                          Detroit, Michigan

3                          Tuesday, March 30, 2010

4                          1:35 p.m.

5

6                          THE COURT:    Case number 10 00322

7     PZ Detroit Board of Education Advisory Council

8     et al vs.  Robert Bobb et al.

9          State  your appearances on the record

10    for me.

11                         MR. JARRETT:  Ernest Jarrett,  Your

12    Honor. I am appearing on behalf of the

13    plaintiffs.

14                         MR. MASSAQUOI:    Hans Massaquoi,

15    Your Honor, Special Assistant Attorney General

16    by appointment for Emergency Financial Manager

17    Robert C. Bobb.

18                         MR. CLEMMONS:    Theophilus C.

19    Clemmens on behalf of Detroit Public Schools.

20                         THE COURT:    Incorporate the entire

21    record into the record and you may now begin.

22         Mr. Jarrett, did you receive  all the

23    pleadings and are you prepared, Sir?

24                         MR. JARRETT:    I am prepared.

25                         THE COURT:   Gentleman, as well.

11111

1          MR. MASSAQUOI:    Yes.

2          THE COURT:    Let's proceed.

3      MR. JARRETT:   Your Honor, before I

4  proceed, I would ask the court two things if I

5  may.

6      First, I am on medication which causes my

7  mouth to dry so I brought a bottle of water with

8  me and I hope the court doesn't mind that from

9  time to time I may have to take a sip or two.

10         THE COURT:    None whatsoever.  Let me

11  see if I can get you a Styrofoam cup.

12         MR. JARRETT:  This is fine. I am fine

13  with that.

14         THE COURT:    Since you mentioned that,

15  that you are on medication, are you OK to

16  proceed?

17         MR. JARRETT:    Oh, Yes.  Absolutely.

18  Just causes my mouth to dry out from time to

19  time.

20  Secondly, Your Honor, we attached several

21  exhibits to the reply brief that we filed

22  yesterday and because of the volume of paper,

23  there were two documents which were not

24  attached. I had them separately marked and have

25  gone through them with counsel. In fact we spoke

26  about it before we arrived here today and I

5

1      would like to tender copies of the second --

2      or the RFP, the primary RFP, Request for

3      Proposal,  which prompted the bidding process as

4      well as the First Student report.

5      I would like to tender to the court

6            MR. MASSAQUOI:   I have no objection.

7            MR. JARRETT:  There was going to be

8      another. He has a copy of the second RFP which I

9      can't  put my fingers on at the moment.

10          MR. JARRETT:   I have no objections to

11     that either.

12         MR. MASSAQUOI:   Can I have that marked

13     real quick, Your Honor.

14         THE COURT:    Yes.

15         MR. MASSAQUOI:   Defense Exhibit No. A

16     has been marked.

17         MR. JARRETT:  Your Honor, then, I have

18     no objection.

19         MR. MASSAQUOI:   He has no objection

20     and I am offering it.

21         MR. JARRETT:  That's correct.  When we

22     were here last Friday, the court indicated --

23     shall I proceed, Your Honor?

24

25         THE COURT:   I am looking to try to put

26     these in order if there is no objection. You

1    don't have a problem in my reviewing them

2    prior to my making the decision.

3

4         MR. JARRETT:  Yes.

5

6         THE COURT:   They are quite voluminous.

7

8         MR. JARRETT:   That's why I had to

9    attach them to the reply brief.

10

11        THE COURT:    Fair enough.  Go ahead.

12        MR. JARRETT:  When we were here last

13   week,  Your Honor, during the abbreviated

14   hearing that we had, the court cited Alliance

15   for the Mentally Ill of Michigan versus

16   Department of Community Health at 231 Mch App

17   647 and Fancy vs.  Egrin, 177 Mich App 714 1989

18   case standing for the proposition or standing

19   for the articulation of the test which a moving

20   party must meet when it seeks a preliminary

21   injunction from the court which is what we are

22   here today seeking.

23

24   The test is very settled and incorporated in the

25   law over decades so it sets forth a four-prong

1    test. So it would be the plaintiff's liklihood

2    of success on the merits in the case.

3

4    The risk of irreparable injury to the

5    plaintiffs, the risk of the injury to the

6    plaintiffs, excuse me, to the opposing party

7    would outweigh the risk of harm to the moving

8    party and the public interest, if any as it may

9    be impacted and I am prepared to address  each

10   of those separately, Your Honor.

11   I begin with the likelihood of success on the

12   merits.

13

14   Your Honor, the plaintiffs have alleged in

15   what we believe has been demonstrated in the

16   exhibits we have attached to our motion that

17   there was a tainted bidding process; that this

18   process was tainted throughout.  Even before the

19   bid process was the taint began and it was

20   tainted because it was skewed in favor of First

21   Student and against the vendors who have been

22   providing services to Detroit Public Schools

23   Transportation Services in particular to Safway

24   Transportation Company which has been a

25   transportation vendor with the Detroit Public

26   Schools since 1975.

1

2

3          I think it is important  that the Michigan

4      Civil Jurisprudence Section  -- the chapter on

5      Public Contracts Section 20 where it said that

6      the purpose of creditor bids for municipal

7      contracts and required contracts to be let to

8      the lowest bidder is to guard against

9      favoritism, improvidence, extravagance, fraud

10     and corruption in the awarding of municipal

11     contracts.

12

13         We submit that the bid process in the instant

14     case has perverted those very purposes and I

15     would submit further that if the court would

16     look to 64 AmJur 2d, Public Works Contracts

17     Section 36, we have a further discussion which I

18     think amplifies what I have just quoted from

19     Michigan Civil Jurisprudence

20

21         It reads in part "... contracts awarded

22     without strict compliance with bidding

23     requirements will be set aside even when there

24     is no corruption or adverse effect upon the

25     bidding process and even where it would save the

26     entity money because it is important to maintain

1    the integrity of government and because of the

2    ease with which public goals undermine

3    competitive bidding requirements may be

4    surreptitiously undercut. Such requirements

5    necessarily  imply equal opportunities to all

6    whose interests and inclinations may impel them

7    to compete at the bidding."

8

9         Your Honor, we submit there has been no equal

10   footing in this process. In fact it was skewed

11   from the beginning. I think you can start with

12   the fact that First through its subsidiary

13   corporation, First Group  was brought in by Mr.

14   Bob, Defendant Bob purportedly for the purposes

15   of performing an independent assessment and

16   evaluation or audit of the Detroit public

17   education, Detroit Public Schools Student

18   Transportation Systems.

19

20        In the very consulting contract which was,

21   which incorporated the agreement between the

22   parties, paragraph 19 which is Exhibit A to the

23   reply brief that we filed yesterday specifically

24   reserves the right for First Student to

25   participate in bidding, securing or otherwise

1       seeking Detroit Public School's business
2       including the student transportation contract.
3            `
4            So we have a situation which is inherently a
5       conflict of interest. On the one hand you want
6       an independent consultant to come in and
7       evaluate the system. On the other hand that very
8       entity that is going to do the audit has an
9       incentive to do the audit in such a way as to
10      ``place itself in  such a way as to place itself
11      in a good position to acquire additional
12      business and in this particular instance that
13      additional business would be a five-year
14      contract worth approximately $113 million
15      renewable without further  bidding for an
16      additional five years. So you have potentially
17      $226 million at stake.
18           `
19           You say to a company, please come in and
20      perform an independent objective truthful and
21      accurate audit. I think when you begin with
22      taint in the process, you can't cure it later on
23      and that is, I think, inherently a conflict of
24      interest.
25           `

1        Now First Student comes into Detroit

2    Public Schools Transportation System. They have

3    unprecedented access for five weeks and as I

4    indicated on Friday, I erroneously indicated

5    that was five months in the complaint but -- and

6    I will address that in the form of an amendment

7    but it is five weeks. Comes in, they have

8    unprecedented access to the personnel, the

9    entire operation, the entire Detroit Public

10   School's Transportation Department operation is

11   subject to their inspection, alterations and

12   otherwise information-gathering as part of this

13   audit

14      No one else was given that opportunity.

15   Safeway Transportation, ABC Transportation, DHT

16   Transportation, those transportation vendors who

17   have provided transportation services for the

18   past four years were not given that access

19   either before or during this audit.

20            `

21      That would be the case as well for Durham

22   Transportation and any other bidders who

23   participated. So First Student enjoyed an

24   incredible advantage by coming in and having an

25   opportunity to gather information in the bid

26   process.

1

2          Now, after they performed this five-week

3     audit, they forwarded to Mr. Bobb a report of

4     approximately 100 pages in length and which I

5     believe is one of the exhibits although I can't

6     tell you which number it is. It is probably No.

7     1  I tendered to the court earlier.  In that

8     the court sets forth a number of the findings --

9

10         MR. MASSAQUOI:    Pardon me.  I am

11    sorry to interrupt.   I just asked him can you

12    identify for the record so the record is clear

13    what document counsel is talking about. I know

14    the document but just so the record is clear.

15    What exhibit has been marked as number one?

16

17         MR. JARRETT:   I don't --

18

19         THE COURT:   Are you talking about the

20    exhibit that has been marked as exhibit --

21

22         MR. MASSAQUOI:    Yes.

23

24         THE COURT:    We must speak only one at

25    a time so that my court reporter can take

26    everything down.

1

2          `        MR. JARRETT:   Absolutely. It has been

3      marked Your Honor.   It is right on your counter

4      next to  the top document. What exhibit number

5      is that?

6          `

7              THE COURT:     This is Exhibit No. 2.

8          `

9              MR. JARRETT:   Exhibit 2 is what I am

10      referring to.   That is the First Student report,

11      Your Honor.

12          `

13          Now in Exhibit No. 2, it says for as many of

14      the findings, a lack of information but

15      certainly not all of it that was gathered by

16      First Student during this audit, it sets forth

17      its recommendation and it also sets forth

18      various different areas in which  it believes

19      that Detroit Public Schools can save money.

20          `

21      Now without regard to the fact that that report

22      in and of itself amounts to a little more than

23      advertisement for the First Student as evidenced

24      by the first two pages of the report which First

25      Student proclaims itself to be the worldwide

26      leader in school bus transportation and

14

1      pronounces all of its virtues, advertisement

2      for First Student becomes the report and

3      recommendation to Mr. Robert Bobb and it also

4      becomes in essence the revised operational plan

5      for DPS.

6          Now what's important about that is this.  As

7      unfair as it was to all of the other bidders to

8      not have the same access as First Student,

9      certainly a 100 page report only condenses and

10     highlights what information they were able to

11     gather during the five weeks, the five-week

12     audit.  They certainly had  other data, other

13     information,  notes that were not reduced to

14     that report and which they enjoyed an inherently

15     unfair advantage over the other bidders but

16     nevertheless to the extent that the report does

17     in fact highlight &&& their audit, when there

18     was a pre-bid meeting and you have to understand

19     there were two RFPs

20         The first Request for Approval suggested that

21     the only routes that were going to be offered

22     for bidding were those routes  which were

23     currently, then currently and still are being

24     operated in-house by DPS bus drivers; the routes

25     which have been the subject of the contracts

26     with the first RFP.

1

2          So, the plaintiffs who were already

3    contractors with DPS as well as one or two other

4    bidders didn't have access to the information

5    First Student had and when they came to a pre-

6    bid meeting, they requested copies of this

7    report and Mr. Terry Burgess would not allow

8    copies of the report to be given to any of them.

9          Now, I don't know what evidence, what

10   rationale justifies such withholding of

11   information to the entities or businesses that

12   were going to bid on this contract. Certainly

13   the more information they had available to them,

14   the more precise their bidding could be.

15          That's, my comment.  It is logical. It is

16   something that anyone could intuitively reach, a

17   conclusion anyone could intuitively reach but we

18   don't have to rely on logic or intuition. All

19   you have to do is look at the two pages of the

20   report itself and Your Hoor, on Exhibit 2, I

21   flagged the page because the numbering of the

22   pages in this report is very unusual and it is

23   difficult to follow. But if you look at Section

24   2 page 7  -- the flagged  page that I have in

25   the exhibit, Your Honor --.

26

1          THE COURT:    Yes, sir.

2

3          MR. JARRETT:   The First Student Rights

4     and Associates provide a detailed list of

5     operating information --

6

7          MR. MASSAQUOI:    I want to make sure we

8     are on the same page.

9

10          MR. JARRETT:   Section 2. It is very

11     bizarre.

12

13          THE COURT:    All right, gentlemen, just

14     as instruction to my court reporter. When you

15     two are talking, just kind of whisper so she

16     knows it's not part of the discussion between

17     the both of you and not part of the record

18     otherwise it will be very difficult.

19

20          You can repeat that by the way.

21          MR. JARRETT:   Your Honor, at the bottom

22     of page 7, the page I flagged, provide detailed

23     district operating information.

17

1          [2]In this setting, First Student says,

2          "...bidders will submit more refined and

3          confidential proposals with accurate information

4          about the operating environment which will

5          result in reduced pricing. Lack of clear

6          definition causes bidders to hedge on pricing to

7          account for unknown costs that may occur during

8          the course of the contract term. Removing the

9          unknown component will allow bidders to bill

10         rates of actual costs. It makes sense. It is

11         logical. You give the bidders more information,

12         they can give you more precise calculations as

13         to what their bids should be. But Mr. Burgess

14         instead of doing what is logical, instead of

15         doing what the DPS consultant says he should do,

16         instead does the exact opposite. He withholds

17         the report over the protests of the bidders

18         without explanation.

19              To this date we have no explanation for why

20         the report could not just simply have been given

21         to the bidders at the time that they were to

22         begin their pricing of their bids.

23

24              The bidders continue -- well, initially, they

25         were informed that First Student would not be

1       permitted to participate in the bidding. Now

2       Mr. Burgess had to know that that wasn't true

3       because right in the contract it says consulting

4       contract, that they would be permitted to

5       participate in the bidding just by the fact that

6       there are supposed to be an independent

7       consultant. But nevertheless, having

8       misrepresented those things to the bidders and

9       without explanation withholding this report, the

10      bidders then began their pricing process and

11      ultimately it was learned that First Student

12      would in fact be permitted to participate in the

13      bidding.

14      So the bidders, most especially Ms. Patricia

15      Whitlow, who is the president of Safeway

16      Transportation Company, raised her own protest

17      again about not having the same information

18      available as First Student and at minimally she

19      should have access to the report.

20      Now mind you, there was no belief that that

21      would fully compensate or level the playing

22      field between the information available to

23      the bidders other than First Student and the

24      information available to First Student .

1       First Student had been in DPS for five

2       weeks but at least the 100-page report should be

3       accessible to the bidders.

4       At that point Mr. Burgess relented and said

5       that each of the bidders would have an

6       opportunity to review the report but he was not

7       going to make copies available to them. Again

8       without explanation and frankly I believe it's

9       inexplicable.

10

11      My client Ms. Whitlow -- and she is my client

12      in another action.

13

14      Ms. Whitlow went to the offices of Detroit

15      Public Schools for the purposes of reviewing

16      this report and when she arrived she found per

17      Mr. Burgess's instructions that she would only

18      have 30 minutes to review the report and that

19      she could not take notes while she was reviewing

20      them.

21      Now Your Honor , I have estimated this report

22      to be approximately 100 pages because of a very

23      unusual page numbering system it really doesn't

24      -- you can't really tell how many pages there

25      just from the numbers and I have not counted the

26      sheets of paper but you have it before you.

1       Certainly it is not a document that one can

2       digest in 30 minutes and retain whatever they

3       have been able to digest in that 30 minute

4       period without taking some notes.

5

6       Why would you bill in such an unreasonable,

7       such an unreasonable withholding of information,

8       such an unreasonable and limited review of the

9       document but for the fact that you have some

10      time.

11

12      There can be no explanation other than

13      that, Your Honor. So, in any event, bids were

14      submitted after this sham of a review of the

15      report and before those bids  resulted in that

16      award,  Detroit Public Schools decided that it

17      was going to expand the offering of the contract

18      not just to the in-house DPS routes but to all

19      of the routes including those which had been

20      serviced for years by local vendors.

21          .

22      THE COURT:  I don't mean to interrupt you. If

23      I am following your argument correctly that's

24      the same  argument that has already been made

25      and the points that you are covering now are

26      contained in the briefs. So we have limited time

1    here and I don't mean to take away from your

2    argument and everything else.

3

4    I have reviewed all of the documents with the

5    exception of the three this afternoon that you

6    have given me a little while ago.  . I  well

7    know that under tab-C you submitted the

8    affidavit of Patricia Whitlow correct?

9        .

10        MR. JARRETT:  Yes.

11        THE COURT:   Why would that have been

12    submitted?

13        MR. JARRETT:  That affidavit augments

14    the allegations in the complaint to the extent

15    that it identifies some specific things which

16    can be found from the report which would have

17    aaffected the  Safeway Transportation's pricing

18    which related to information that was not

19    available to Safeway but was available to First

20    Student . It also sets forth in detail other

21    factors such as the fact that the bids that they

22    award was announced. Ms. Whitlow went to the

23    office of ABC Transportation and had a

24    conversation with Mr. Johnny Grant who is the

25    president of ABC Transportation and unbeknownst

26    to him at that particular time through an

1       application on her cell phone she was able to

2       record their conversation.

3

4             THE COURT:  Was that legal?

5       .       MR. JARRETT:  It was not by telephone. I

6       believe there  is nothing that prohibits that.

7       Over the telephone it would not have been legal.

8             THE COURT:  Well maybe that's an issue

9       I'll have to address later but there is a

10      question that may be raised in terms of if

11      that's contrary to Michigan statutes or not.

12      That's one point.

13            The affidavit is duly signed and

14         notarized?

15            .

16            MR. JARRETT:  Yes, Your Honor.

17            THE COURT:  It also could appears to

18      contain hearsay statements. So the question has

19      to be raised, is it proper for the court to

20      consider these statements in terms of making the

21      decision. I will let you address that issue.

22

23            .

24            MR. JARRETT:  Well, Your Honor , it

25      relates to which statements the court is

26      specifically speaking about but however with

1    respect to the recorded conversation between

2    herself and Mr. Grant, which we have provided a

3    transcript for, the affidavit indicates simply

4    that she has compared the transcript to the

5    recorded conversation and that the transcript we

6    looked at is in fact true and accurate, a true

7    and accurate transcription of the recording. We

8    have the recording available for the court

9    should that be required. So I believe for the

10   purpose of this particular hearing where the

11   court is looking to see whether or not there is

12   a likelihood of success on the merits, I think

13   that the court can take that into account. I

14   don't believe that the strict rules of evidence

15   would apply.

16       I also believe that if necessary I can call

17   Ms. Whitlow to the stand and lay a foundation

18   for the circumstances under which the statements

19   were made which will fall well within  any one

20   of the hearsay exceptions.

21       And finally, Your Honor , I took the

22   deposition of Mr. Grant last week and one of the

23   questions that I asked him was whether or not

24   the -- first of all he identified himself as the

25   speaker in the recording. He listened to it. He

26   said that was him. He recalled the meeting, he

24

1    recalled the discussion and I asked him if

2    the things that he said in the meeting were true

3    and he said that they were.

4         Now, I don't have a transcript --

5

6         .

7         THE COURT:  That doesn't make it legal

8    and then the question is, if you are asking for

9    equity as part of the process that you also must

10   come here with clean hands.

11

12        MR. JARRETT:  Your Honor, I don't

13   believe our hands  are soiled in the least. I

14   represent parties who are not parties to  that

15   conversation and we have, we are presenting to

16   the court the substance of the conversation, the

17   substance of which would reveal that after the

18   first RFP was submitted, Mr. Grant was given

19   information on the bids of his competitors.

20   Safeway was not given any such information and

21   certainly when there was a second RFP that was

22   filed in January, he had the benefit of knowing

23   the basic pricing structure of the competitors;

24   could expand that and project that from the

25   limited in-house routes that were out for bids

26   to the projection of over all of the routes. It

1    was simply a matter of quantifying further

2    the routes that were being taken into account in

3    the second RFP that weren't subject to the first

4    one.

5           THE COURT:    Okay, go ahead

6

7           MR. JARRETT:  So, according to Mr.

8    Grant, he had this information. No such

9    information was given to any of the other

10   bidders including Safeway or Durham or DHT and

11   therefore he had a significant advantage in the

12   re-bidding process and I think that you can

13   infer that if one of the contract awardees had

14   access to this information that both of them

15   did.

16

17        In January, according to the second RFP which

18   is a document which Mr. Massaqoi had marked as I

19   believe that it's probably Exhibit 3 for the

20   purposes of today's hearing, the second RFP, all

21   this was supposed to submitted by, I believe,

22   January 15, 2010 at 11 in the morning. After

23   that, no other bidding material was to be

24   accepted.

25        There was not to be any exchange of

26   information or release of information from DPS

1        to any of the bidders other than the

2        identities of all of the bidders.

3

4            What we know is that on February 2, almost

5        three weeks later that Mr. Grant was called into

6        the offices by Mr. Glaster, Leon Glaster, who is

7        the defendant in this action, seated in the

8        courtroom here today someplace and Mr. Terry

9        Burgess and what happened there undermines the

10       very bid process in the first place.

11

12           What happens there is that he was told -- he

13       is given certain information and he was allowed

14       to submit a modified bid. None of the other

15       vendors were permitted to do that. Safeway

16       certainly wasn't. I don't believe DHT was, I

17       don't believe Durham was but we do know that he

18       was and we believe that so was First Student

19

20           If you look, Your Honor, what we have

21       attached to our reply brief as Exhibits D. and

22       E., if you look at Exhibit D., that is the

23       timely-filed RFP for the second -- excuse me,

24       response to the second RFP by ABC. If you look

25       at E, what you have is clearly identifiable as a

26       last and final offer submitted to Detroit Public

1      Schools by ABC and there are several

2      modifications if you look at and compare the

3      two. Number one, ABC's daily rate is reduced.

4         Mr. Bobb's attorney speaks to the fact that

5      well this is about pricing and if First Student

6      has the best prices, that's why they got it in a

7      fair and square bid process. That's what they

8      say and that's why they are here to oppose us.

9      But clearly, Your Honor, if you submit bids in

10     the fall and release information on that and you

11     submit bids again in the winter and then

12     selectively allow certain individuals or certain

13     companies to submit modified bids, then we don't

14     have an even playing field. We don't have a

15     fair, square process. We have selective and

16     favored negotiations with certain participants

17     in the bidding process to the exclusion of

18     others and in fact we don't have a bid process

19     at all under those circumstances.

20

21        Your Honor, I have cited authority in my

22     brief which says that a public body has no

23     authority to favor one of the bidders by

24     negotiations with the bidder privately. Such

25     private and selective negotiations are improper

26     per se and we cite the case of Attorney General

1        vs. Public Lighting Commission, 155 Michigan

2        207 a 1908 case and Whitney vs. Common Council

3        for the City,  excuse me, for the Village of

4        Hudson, 69 Mich 189. That's an 1888 case.

5

6        Also draw the court's attention to Civil

7        Jurisprudence Public Contracts Section 20 on

8        that very point. So that the very improper type

9        of negotiation with selective bidders to the

10       exclusion of others, which these cases address,

11       is precisely  what occurred which enabled  ABC

12       to submit a bid, a secret bid because none of

13       the other bidders were aware of it and when it

14       was done, a secret bid to DPS after the bid

15       process was purportedly closed per the language

16       of the RFP itself.

17             He submits  this bill and it is still

18       not to the satisfaction of Messrs. Glaster  and

19       Burgess who met with Mr. Grant on February 2 and

20       during that meeting, oh, I want to go back for a

21       minute. I'm sorry Your Honor.  If you compare

22       Exhibits D. and E. you will see that Mr. Grant's

23       pricing, his daily rates were modified in the

24       second -- or excuse me, best and final which was

25       after his third written bid. They were reduced

26       at that point.

1          Under the section which goes to the

2     purchase of the DPS  fleet  of buses, his

3     initial bid filed in January, he indicated that

4     he would pay the fair market value of all those

5     buses based upon an independent appraiser's

6     appraisals of those buses at  prices -- --

7     mutually selected by DPS and ABC.

8          Now the best and final offer, suddenly his

9     offer is $2.6 million and change.

10

11          This clearly came after he had an opportunity

12     to be coached on that by Messrs. Burgess and

13     Glaster.

14

15          Even after submitting this third secret bid,

16     that apparently was not to their satisfaction.

17          On February 2 they met  further and there

18     were further discussions as is outlined in the

19     transcript of the conversation between himself

20     and Ms. Whitlow stated at various points

21     throughout, and I draw the court's attention to

22     page 14 of that  transcript which is Exhibit C,

23     Your Honor,  beginning at line 21.  This is in

24     mid-flow of a particular comment he was making.

25               THE COURT:  Again, you  are talking

26     of a conversation between Whitlow and Grant?

1

2          MR. JARRETT:  Yes.

3          THE COURT:  You are talking about the

4    recorded conversation?.

5          MR. JARRETT:  Yes.  I am, Your

6    Honor.

7          THE COURT:  I haven't been given

8    authority to be persuaded one way or the  other

9    in terms of your position.

10

11    I will indicate to you where I am coming from

12    and then I will allow you to argue but please

13    bear in mind is that we are running short on

14    time and the longer you concentrate on

15    chronology and things, it may not be an

16    effective point to think that are crucial to

17    your argument.

18    Your opposition is very well laid out in

19    terms of the brief  and the exhibits and

20    everything else.

21

22    According to MCL 750.539(c), recording a

23    conversation without consent of all parties is

24    illegal.

25    I will now cite  to you the following cases

26    that support the Court's position. One is People

1       vs. Stone, Michigan Court of Appeals opinion

2       234 Mich App  117 and I will read the  head note

3       portion of it for the sake of brevity. It says

4       the court held that Michigan Eavesdropping

5       Statute did differentiate between wired

6       electronic and oral communications but for

7       texted  private conversations. The court

8       concludes there that the interception of any

9       part of a private disclosure of others without

10      their permission was prohibited.

11          In addition to that I will cite the case of

12      People versus -- I'm sorry, it is the same case

13      but this is from the Michigan Supreme Court at

14      460 Mich 558.

15          Again,  all the technology provides the means

16      for eavesdropping. The Michigan Eavesdropping

17      Statute specifically protects citizens against

18      such intrusion therefore it is not unreasonable

19      for a person to expect privacy in a conversation

20      although he knows the technology makes it

21      possible for others to eavesdrop on such

22      conversations."

23

24          It would appear based upon these authorities

25      that the position taken --  The statute I read

26      at 539(c) is as follows:

1        --- for your benefit.

2        "…Any person who was present or who was not

3        present during a private conversation who

4        willfully uses any device to eavesdrop on a

5        conversation without the consent of all parties

6        thereto or who knowingly aids, employs or

7        procures another person to do the same in

8        violation of the statute is guilty of a felony

9        punishable by imprisonment in a state prison for

10       not more than two years or a fine of not more

11       than $2000 or both and again, I would note that

12       the affidavit of Ms. Whitlow is attached here

13       under tab B.  It is a sworn affidavit in which

14       she indicates that she recorded the statement.

15               Paragraph 13.

16       ".. .on the morning on which Mr. Bobb

17       announced the contract award, I went to the

18       offices of ABC and had a discussion with Mr.

19       Grant with an application on my cell phone  I

20       was able to record a substantial portion of the

21       conversation…" and in parentheses she says, "..

22       the phone stopped recording before we stopped.

23       However Mr. Grant was unaware that our

24       conversation was being recorded."

25       It appears to be  in conflict with the case

26       and the statute and perhaps - I wo't make the

1      conclusion here, but perhaps she just

2      admitted to violating this Michigan statute and

3      created a felony.

4         Is Ms. Whitlow here?

5              MR. JARRETT:  She is, Your Honor.

6              THE COURT:  Where is Ms. Whitlow.

7              (Identifies herself)

8              THE COURT:  You may continue.

9              MR. JARRETT:  Your Honor, with

10     respect to the negotiations which were secret

11     negotiations which went on even after the

12     submission of the modified bid by ABC, Mr.

13     Burgess - we have attached Exhibit F, forwards

14     to Mr. Grant a new bid sheet which he has

15     prepared and in that bid sheet he basically

16     informs Mr. Grant as to what his bid would be.

17     And, if you look at Exhibit F., we have the e-

18     mail of Terry Burgess to Mr. Grant. It says

19     please review the attached. I will call to

20     follow up.  Attached to that was the bid sheet

21     which was now prepared and submitted by ABC.  It

22     was prepared presumably by Mr. Burgess and

23     forwarded to ABC by Mr. Burgess and when he

24     instructed him this was going to be his bid and

25     then following that, there was the announced

26     award, I believe, on February 23.

1

2          So, what we have identified, I think is a

3     clearly tainted process and I think there is

4     ample and significant evidence demonstrating

5     that the -- to which most of which is not and

6     cannot be refuted by Mr. Bobb nor anyone else

7     participating.

8

9          The next issue or element that we have to

10    demonstrate is that there be no irreparable

11    injury to the plaintiffs if the court does not

12    intervene and on that point Your Honor, I would

13    point out a couple of things. First that as we

14    alleged in the complaint,  First Student has a

15    very troubled and problematic service history in

16    various districts around the country; has no

17    service history with DPS but it has a history of

18    things ranging from its own manager, operations

19    manager in Indianapolis being cited with two

20    counts of failure to maintain a school bus in

21    Indianapolis by the Berrien County prosecutor.

22

23         We have that  25 percent of their buses

24    devoted to that school district were put out of

25    service by inspection by the Indiana State

26    police.

1       In Ohio in 2007, First Student was put on

2       probation for its failure to properly conduct

3       background checks of its drivers and then last

4       year, proceedings were initiated for First

5       Student's violation of that probation.

6

7       In Illinois, perhaps the most troubling of

8       them all, we have five instances of drivers

9       devoted to their Chicago route being arrested

10      and charged with sexual misconduct with respect

11      to the students, some of the female students

12      that they are charged with driving including one

13      who is charged in 2009 who had been fired from

14      the Joliet Township Illinois School District for

15      the very same thing.

16      So while I understand that the probation in

17      Ohio and the instances in Illinois are in two

18      different states, much less two different

19      districts, I think that there is some evidence

20      and some relationship between a company being

21      cited background checks in one state and having

22      five instances within an 18 month period of

23      sexual misconduct with respect to its drivers

24      transporting the Chicago students to and from

25      school. And that does not even take into account

26      the DUIs, the high-speed chases in school buses

1        that occurred by First Student drivers in

2        that district.

3            Mr. Massquoi in  his brief said  that

4        certainty  a company of that size over the many

5        years, some of the drivers will misbehave. And

6        there is some merit to that. You can't control

7        everybody's conduct all the time including those

8        you employ. In 35 years of business, Safeway has

9        never had any such problems, not one. But

10       nevertheless you would think that that would at

11       least provide one of the criteria by which the

12       companies would be evaluated. What is your

13       service history?

14

15              THE COURT:    How is that supported

16       by anything submitted to the court?

17              MR. JARRETT:  It is supported by the

18       fact we have allegations that have not been

19       denied. There are two allegations in support of

20       the brief in opposition that were executed by

21       First Student officials or representatives and

22       they are denying a lot of things.  They tried to

23       deny things that are undeniable but they didn't

24       touch that. They didn't deny a single one of

25       those.

26

1          We have information, we have information

2     and belief that these facts are in fact true and

3     if they weren't in fact, whether they are true

4     or not, they are at least out there to be

5     inquired about and they were not part of the

6     evaluation process. It was not something that

7     the RSP called for and we submit that the RSP

8     was drafted in substantial part by First Student

9     in the first place so certainly it is not going

10    to include in the criteria something which would

11    not look favorably for them in their bid for the

12    contract.

13         Now my clients, Ms. Liggins is the parent of

14    three DPS students, one of whom is already on a

15    bus every day going to and from school. Two of

16    whom will be joining them as soon as they make

17    the transition to middle school.

18         She doesn't want -- she doesn't want her

19    children having to get on the bus by a company

20    that has not been properly vetted when there is

21    ample information about problems all over the

22    country. It has the highest  accident rate in

23    Duval County, Florida.

24

1          THE COURT:    Please turn off

2     your phone whoever is in here. Please turn off

3     your phone. Go ahead sir.

4          MR. JARRETT:   In Buffalo New York,

5     First Student buses were understaffed to the

6     point  where students were being picked up 45

7     minutes late because they didn't have enough bus

8     drivers to drive the routes. I have already

9     talked about problems in Indiana and Illinois

10    and in Ohio. And these matters are matters which

11    DPS may have some explanations for  -- excuse

12    me, First Student may have some explanations for

13    but they at least should have been part of the

14    evaluation process and Mr. Bobb did not make any

15    inquiries along these lines and certainly it is

16    a criteria, criterium  that had it been used

17    that it would have very favorably benefited the

18    local vendors, at least Safeway if  not others

19    and would have been something that  should have

20    been taken into account.

21

22    Ms. Liggins does not want her children to be

23    exposed to  those kind of problems. This is her

24    only recourse.

25    I have Ms. Payne who is a grandmother among

26    other things as a plaintiff in the action. She

1    doesn't want her grandchildren exposed to a

2    bus company that can't seem to get it together

3    wherever they go and who acquires a contract

4    award through a tainted bid process, whether

5    it's a history of five sexual predators in one

6    district  within 18 months or the fact that

7    there is a high accident rate in the school

8    district or that they can't even stay to a

9    probationary status and adhere to that in their

10   home state of Ohio.

11       Those risks of harm are what my client

12   children and grandchildren and all of the

13   children, all of our children and that's where

14   the other plaintiff comes in, the Detroit Board

15   of Education Advisory Council which is an

16   advocacy group that speaks on behalf of all the

17   students of the DPS.

18       They don't want to have a company that seems

19   to not be able to do anything other than collect

20   its paycheck in these districts without some

21   sort of problems when there is ample evidence

22   that the businesses, the vendors already in

23   place have performed admirably well for decades

24   and were not -- they were disallowed the

25   opportunity to participate in a fair bid

26   process.

1        So, I believe Your Honor, we have

2    demonstrated irreparable injury. I don't believe

3    that there is any potential injury to the

4    defendants in this case.

5        They suggest they have to meet this May 17

6    deadline. That's an illusory deadline. The

7    history as evidenced in Ms. Whitlow's affidavit

8    is that the contract for transportation vendors

9    have never been finalized before late summer

10   prior to the school year sometime around the

11   mont of August.   So May 17 is a date that was

12   decided by First Student for First Student's

13   benefit and they want to go out and they want to

14   secure the contract, they want so much momentum

15   going towards executing this contract that it

16   can't be reversed later and I submit that there

17   is not going to be any injury to them if we

18   ultimately do not prevail on the merits. And

19   certainly if the court would entertain this

20   matter on an expedited basis and could dispose

21   of it well in advance of that time needed to put

22   in place whatever transportation company or

23   companies will be ultimately contracted with

24   DPS. whether it be the current awardees or

25   different awardees.

26

1          And finally Your Honor, the last issue that

2     we have to address is the public interest.

3

4          Your Honor, it is in the public interest to

5     go about a bid process which is fair and which

6     will invite objectively good, precise and

7     refined bids where there is true competition

8     rather than a façade of competition  to favor a

9     predetermined awardee and to eliminate someone

10    who has been in business for 35 years and has

11    done quality work all of those years. The public

12    interest would demand integrity in the award

13    process. We have anything but that in this

14    particular process and so the public interest, I

15    believe, would require this court to enter a

16    preliminary injunction, maintain the status quo,

17    put this matter on an expedited docket so that

18    we can conduct what further discovery is needed,

19    come back and try the case on the merits should

20    that be necessary.

21

22         Does the court have any questions?

23

24              THE COURT:   No. We will hear from

25    the other side.

26

1           MR. MASSAQUOI:    Your Honor,

2      could I get some water real quick.

3           THE COURT:    Yes, sir.

4           MR. MASSAQUOI:    Again, Hans

5      Massaquoi on behalf of Defendant Bobb.

6        Your Honor, we have had an opportunity to

7      read the briefs and we have listened to the

8      plaintiff and we have a few things as you might

9      imagine to say.

10

11        First, with all due respect and with all

12      deference to Mr. Jarrett, frankly I think that

13      he has, he is under great misconceptions most

14      probably because he didn't read the very

15      documents completely that he has submitted to

16      the court.

17

18        I will go through those documents in specific

19      areas which essentially refutes everything that

20      he has said  today about the alleged taint on

21      the process; on the DPS bidding process subject

22      in this case.

23        I would like to start out also by indicating

24      to you  that make no mistake about it, we have

25      the advisory Council and two

26      plaintiffs,individuals who are named as

1          plaintiffs but make no mistake this case is

2          being driven by Safeway. That's why we don't

3          have affidavits attached to any of the

4          plaintiff's documents except an affidavit from

5          Safeway's president. We have surreptitiously as

6          the court has noticed, surreptitiously recorded

7          statements by Safeway's president. Neither of

8          the other two plaintiffs in this case submitted

9          affidavits or gave any support, virtual support

10         to these allegations. No one from the advisory

11         Council submitted anything in support of these

12         allegations and even Counsel slipped and said my

13         client  Ms. Whitlow and then said well I am

14         representing her in another case.

15         Let me tell you,  this case is all about

16         Safeway.  Safeway doesn't have standing to be

17         here.  They have another case in federal court

18         right now and this is nothing other than Safeway

19         trying to get a second bite at the apple because

20         they are dissatisfied with the fact that they

21         lost the bid and this is just an attempt to

22         upset the apple cart.

23

24         I am going to go through here quickly, Your

25         Honor. I listened to your admonitions about

1     trying to move it along and I'm going to try

2     to do that.

3

4               THE COURT:   I'm not sure that's an

5     admonition.

6

7               MR. MASSAQUOI:   Maybe that's wrong.

8

9               THE COURT:   It is my responsibility

10    to make sure the lawyers  stay on point that

11    based upon the limited time we have that -- if

12    you wish me to admonish you, I'm all for that. I

13    can assure you there is a difference between

14    admonishment and simply control of the process

15    as the court rules give me the authority to do.

16

17             MR. MASSAQUOI:   I've been admonished so

18    many times by my father. I just assumed that was

19    another one.

20

21             THE COURT:   I am old enough to be

22    your father. Let's proceed.

23

24             MR. MASSAQUOI:    First of all

25    let's go right to the issue of the likelihood of

1       success on the merits here. Plaintiff's

2       likelihood of success.

3           First of all I would like you please -- do

4       you have our brief, that is Defendant Bobb's

5       brief and Exhibit 2 attached to it?

6

7               THE COURT:   I will hold it up. Is

8       that what you're referring to?

9

10              MR. MASSAQUOI:   That is it.

11

12          You will see in there -- first of all it is a

13      contract between the state of Michigan and

14      Robert C. Bobb. It says to emergency financial

15      manager for the Detroit Public Schools pursuant

16      to 1990 Public Act 72.   I ask the court  to look

17      at the bottom of that page where it says number

18      one. First  page, bottom of page, you will see

19      where it says power of the emegency financial

20      manager.

21

22          It says upon  appointment the emergency

23      financial manager shall immediately assume

24      control over all fiscal matters and shall make

25      all fiscal decisions for the district.

26

1        Also on the next page at the top, Section

2        1.2 it says the emergency financial manager

3        shall have all powers enumerated in the act

4        which include but are not limited to the

5        following. And if you look on Section C directly

6        below that it says, negotiate, renegotiate,

7        approve and enter into contracts on behalf of

8        the district.

9        Let me ask the court to please turn to page

10       6-sub-9 of that same document.

11       Do you see where it says, Your Honor, the

12       heading 12?

13                       THE COURT:    Yes.

14                       MR. MASSAQUOI:    It says limitation

15       upon liability.

16       It says, "… the state of Michigan, the

17       governor, the superintendent of public

18       instruction and the emergency financial manager

19       are not liable for any allegation or claim

20       against the district resulting from actions

21       taken in accordance with the act or this

22       contract and below that it says, "...when acting

23       under this contract, the emergency financial

24       manager shall be deemed to be engaged in the

25       exercise of a governmental function and shall be

26       immune from liability for any action taken which

1    he reasonably believed to be within the scope

2    of his authority granted by the statute under

3    this contract."

4        The point there is as I am pointing those

5    out, those sections is that not only has Mr.

6    Bobb been given absolute authority over matters

7    in correcting their fiscal situation in the

8    public schools, he has absolute immunity in

9    doing that. He has governmental immunity.

10       Now, I'm just going to move forward.

11       Also, contrary to what Counsel says, I do not

12   believe -- and I won't belabor this point --

13   that the plaintiffs have established any

14   standing as taxpayers. In fact, there is no --

15   in Michigan, it has long been the trend that

16   individuals don't have a right to indicate the

17   rights of the public unless they show special

18   harm.  These plaintiffs have not shown any

19   special harm. In fact Mr. Jarrett just argued

20   that they have an interest in seeing, along with

21   the public, that there will be a valid and --

22   whatever the term was, bidding process and that

23   children in the public schools are safe from

24   busing companies that may have had some past

25   violations either under the law or some service

26   violations. I am paraphrasing Mr. Jarrett. But

1    the point is this advisory council, we don't

2    even have an affidavit from them. We don't know

3    what their mission statement is. They have just

4    come into the case and all of sudden they

5    advocate on behalf of the public. I don't really

6    know that the public would even want their

7    advocating on behalf of them. There is nothing

8    to establish their right to come into this court

9    and make these arguments.

10        One of the -- only one was even listed as a

11    taxpayer and as Mr. Jarrett just indicated, she

12    is listed solely as the grandmother of a student

13    who goes to public schools.

14            Going further, Your Honor, even further,

15    and more fundamental to this case is that

16    plaintiffs have not shown that the DPS or the

17    emergency financial manager violated any law

18    whatsoever. We pointed out in our brief and

19    there has been no response to it -- well Counsel

20    has cited in which he says the public -- he

21    cited AmJur  which No. 1, isn't authoritative in

22    this  state. He cited 1800 - cases from the

23    1800s, and what Your Honor -- first of all the

24    Michigan legislature has preempted this field on

25    this issue.

26

1         As I've pointed out at MCI 380.1274, the

2    Michigan legislature specifically addressed what

3    the procurement requirements are for the DPS.

4    They addressed this issue and there they said

5    very clearly that the only regulation that they

6    put on the DPS is governing under 380.174 the

7    procurement of supplies, competitie bidding

8    requirements, exemptions, policy preference for

9    Michigan-based businesses, source of funds for

10   payment, purchase leasing or rental of heating

11   and cooking equipment.

12

13        They specifically left out contracts

14   governing services. They could have easily --

15   here the legislature is talking about what the

16   DPS has to do to run a procurement department

17   and they specifically leave out services and

18   there is no question in this case that

19   transportation, busing, student busing is

20   services.

21

22        So these common law cases from the 1800s have

23   no applicability and they are certainly not

24   controlling in this case and Counsel made a big

25   point of how we didn't refute some of his

26   allegations. We put that in our brief. He hasn't

1          refuted that in his response to us. There is

2          no law. He hasn't come back and cited the statue

3          showing what procedures were required of us in

4          the procurement process. We have put forward

5          affidavits. By contrast. We have put forth

6          affidavits from numerous individuals who were

7          directly involved with this procurement process.

8          We put forward Mr. Kevin White who is the

9          director of procurement. That's attached to our

10         brief at Exhibit 3. He ran this procurement

11         process except that he speaks from his own

12         personal knowledge of what was done and what

13         happened here.

14             They make all kinds of allegations and we

15         will talk about them briefly. He refutes those.

16         So does Mr. Glaster who has produced an

17         affidavit under tab-1 to our -- these are people

18         who have absolute personal knowledge and were

19         involved in this process themselves. They are

20         not depending upon information and belief, we

21         guess, we speculate, we think. That's not what

22         these are. These are people who were involved.

23             Let me also mention under tab-5, Your Honor.

24         It is the affidavit of Mr. Minnick. He is the

25         director of transportation for the DPS.

1        Intimately familiar with all of the details

2        of what happened here.

3

4                THE COURT:    Just for the sake of

5        the record and my reporter Glaster, g-l-a-s-t-e-

6        r, . And it is Kevin White, w-h-i-t-e, and then

7        Mr. I'm not sure if it's going to be Rev. David

8        Duke, d-u-k-e, and reference to a m-i-n-i-c-k.

9        The last one is Richard Klaus, k-l-a-u-s.   You

10       may proceed.

11

12               MR. MASSAQUOI:    Your Honor another

13       point, Your Honor.   The plaintiff simply ignores

14       the law in Michigan which cited on page 7 of our

15       brief, Great Lakes case which says there is a

16       presumption. The governmental authorities act in

17       good faith in the contract selection process. So

18       they have a hurdle to get over here Your Honor

19       which as we will show with point after point.

20       They have failed to come close to getting over.

21

22        ``    THE COURT:   I'm sorry. I do it now or my

23       court reporter will come back later. So it is

24       Great Lakes Heating, Cooling and Refrigeration

25       and Steel Metal Corp. versus Troy School

26       District 197 Mich App 312.

1          MR. MASSAQUOI:  Your Honor, let's just

2     talk about this for a second.  There is a litany

3     of factual allegations that plaintiff makes,

4     that plaintiffs make that is simply wrong.

5     Counsel already acknowledged one and it is

6     critical. He said that First Student had access

7     to the DPS and its employees and documents et

8     cetera for five months. Now he has announced

9     that no, it was only five weeks and that's

10    really important in this case and it is not

11    something that you just -- I mean I am not

12    accusing Mr. Jarrett of doing anything

13    intentional but what I'm saying is it is

14    important for the court to realize that that

15    particular amount of time is very significant

16    because they say that during that five weeks

17    that First Student had access to the DPS, it

18    gained so much information that it has an unfair

19    advantage in this process.

20

21         Well, let's think about that for one second.

22    They are claiming that with five weeks  First

23    Student, and that's undisputed, five weeks of

24    access. They got more information than Mr.

25    Jarrett's  client who worked for 35 years as a

26    contractor, eight bus contractors for the DPS.

1       Simply put, they get more information than

2       the company that has been -- who knows the

3       streets, who knows the students, who knows the

4       schools, who knows the ordinances, who knows the

5       details, who knows the gas stations, everything.

6       They got more information in five weeks --

7       that's what you have to believe to believe that

8       they got an advantage over First Student, I'm

9       sorry, over Safeway. It is not plausible and we

10      will go on with that. They alleged that First

11      Student drafted the RSP. Now Kevin White  in his

12      affidavit which is attached under - to our brief

13      at --  Exhibit 3 states specifically that is

14      just not true. He states that -- it's cited in

15      our brief, Your Honor. The point is he's said

16      that he drafted it. So it wasn't First Student

17      that drafted it. Plaintiffs have absolutely no

18      way of knowing who drafted this. It is all just

19      supposition, innuendo, suggestion. They don't

20      know that.

21         Another allegation they make is that the DPS

22      limited vendors' view of First Student's report

23      to half an hour.

24

25         THE COURT:  You are making reference

26      to Mr. White's affidavit?

1          It is not in the body.

2               MR. MASSAQUOI:    It is in the

3      affidavit, paragraph 9.

4

5               THE COURT:  When you are speaking,

6      paragraph 9 says the following:

7          Mr. White:   Also contrary to the complaint

8      has alleged, First Student did not draft the

9      subject RFP. I did. Just so the record is clear.

10         Go ahead please.

11              MR. MASSAQUOI:  Let me just roll

12     back, Your Honor, to that issue.  A minute ago

13     we heard that Mr. Jarrett said well -- and look

14     at the RFP, it doesn't ask any questions about

15     the  safety record of the bidders and  wouldn't

16     you imagine that that should be there?

17         Well see the point is this. Mr. Jarrett

18     although the plaintiffs may want that to be in

19     the RFP, they don't get to write the RFP.  The

20     DPS does and you don't get to overturn a

21     competitively-bid contract simply because the

22     RFP didn't contain the questions that you wanted

23     in it. And they haven't shown any law that

24     suggests that they have a right to have this

25     overturned because we didn't ask the questions

26     that they would have liked us to ask.

1          Additionally they talked about the safety

2     record and we will get back to that.

3          And the affidavits attached to our  -- we

4     indicate First Student has 16,000 employees,

5     drivers and it transports four million children,

6     four  million children a day.  Safeway has 200

7     drivers, approximately. I would expect that

8     First Student might have had a few more troubles

9     and citations along the way. I don't think that

10    establishes any irreparable harm or that it will

11    happen here. There are a whole lot of questions

12    that are left unanswered and I note that the

13    court noted, the plaitiffs didn't attach a

14    single thing in their motion or their complaint

15    or their reply brief to suggest that this is

16    accurate.

17         They just said that, well, we didn't refute

18    it.

19         I remind everyone that the burden is on the

20    plaintiffs to  meet the likelihood of success on

21    the merits and to get over the presumption that

22    this process was made in good faith which

23    clearly they just haven't done and haven't tried

24    to do.

25         They put in there again as we  were saying,

26    they put in there --  they argue that Ms.

1    Whitlow was only given 30 minutes to review

2    First Student's report.   That is flatly denied

3    by the affidavit of Kevin White who says they

4    were given as much time as they wanted.   They

5    simply couldn't read -- couldn't remove the

6    document and they wouldn't let them photocopy

7    the document. That is what he says in his

8    affidavit.

9        Also, another point that we made, Your Honor

10   which plaintiffs completely ignored is that this

11   document was always available through FOIA. They

12   could have gotten it at any time they wanted to.

13   They just didn't.   It even indicates that in the

14   document and they, they just didn't do it and

15   then they complained that they didn't have a

16   copy of it .   But I noticed now when they come

17   to court they have a copy of it. So I don't know

18   where they got it but the point is they got it.

19   They have it and they could have gotten it at

20   any time and they want to blame the fact that

21   they didn't have First Student's report and they

22   want to blame it on the  fact that now they make

23   the argument that well, if we had had  First

24   Student's report we would have known all these

25   things and we would have been able to prepare a

26   more competitive bid. And that's why this whole

1    process was a sham because we didn't have

2    that information. We are going to go through

3    that.

4

5        First let me say however they say that Mr.

6    Burgess and Mr. Glaster opened  sealed bids. Mr.

7    Glaster absolutely categorically denies that in

8    his affidavit and I don't know how that

9    plaintiffs could possibly know whether Mr.

10   Burgess and Mr. Glaster opened sealed bids. And

11   they don't state anything either in their

12   complaint or their motion that would even

13   establish a foundation for how they could

14   possibly know that.

15

16       They allege in their complaint that  ABC will

17   be -- they say this whole process was designed

18   to push this contract to,  First Student. It was

19   all a sham is what they said. Think about this,

20   Your Honor.  First of all as I indicated before,

21   the emergency financial manager has total power.

22   He doesn't even have to put this contract out

23   for bids. He could put this for a no-bid

24   contract.  He could have simply awarded the

25   contract to First Student right off the bat. So

26   to believe what the plaintiff is saying,

1    absolutely I stand by that. That's true. He

2    could have simply awarded it. There is no law in

3    Michigan that says he has to put a services

4    contract out for bid.

5

6    So now you have to believe that though he

7    could have just handed the contract to First

8    Student he said no, let's just create a sham

9    process and then set it all out and then we

10   subvert it  just so that we can make it -- as I

11   said, an appearance that it  was fair. He didn't

12   even have to make an appearance that it was

13   fair. He could've just given it to them and it

14   would have been all over. They have never

15   answered that, Your Honor. They argued that ABC

16   -- and they said they really wanted  to push

17   this contract to First Student and they said

18   that First Student,  just the fact that they

19   added ABC to the contract, they said, you know,

20   that's just another ploy because the truth is

21   they really were pushing it out to First Student

22   and they said that ABC will be acting under the

23   control of First Student.

24

25   The problem with that is, Your Honor, as we

26   indicated in our complaint, I mean in our

1    motion, and it is supported by affidavit of

2    Mr. Minnick, the contract hasn't even been

3    drafted yet. So how do they know that. How do

4    they know that ABC is going to be a de facto

5    subcontractor when nobody has seen the contract

6    yet?

7

8    I would like to go -- just a few  other

9    issues on the likelihood of success.

10

11    THE COURT:   Why don't we move on to

12    the other point.

13

14    MR. MASSAQUOI:   Yes. They mentioned

15    -- I would have to mention, Your Honor, the

16    Whitlow affidavit which they made a  point about

17    that.

18

19    As Your Honor pointed out, it is full of

20    hearsay. Ms. Whitlow simply talks about her

21    assumptions. She admits in that very affidavit

22    that she wasn't the lowest bidder.  She admits

23    that her bid was $3.5 million higher than the

24    lowest bidder. She talked about a number of

25    things. She lists six things in there which she

26    says were -- if she had only had this

1    information she would have been able to

2    provide a more competitive bid.

3         Let me ask you this, Your Honor and I will

4    cut through this just to get to a point that I

5    would like you to look at, please.

6         Can you look at the first RFP that was given

7    to you, I forget what exhibit we marked it this

8    morning when we started.. It is the document

9    that says, Request for Proposal across the top

10   and it says July down in the right corner.

11                  THE COURT:   Okay.

12        Let me look at the Whitlow affidavit for a

13   second.

14        In the Whitlow affidavit, Your Honor,

15   paragraph -- I'm sorry. It is at paragraph 20  -

16   - I want to get the right page. On page 4.  Four

17   yes,  she lists a number of things that she

18   said. If only I had this information from the

19   First Student report we could have really

20   submitted a more competitive bid and I ask you

21   to turn to -- I don't want to go through all of

22   them although I was prepared to do that. Under

23   D, sub-D it says -- where it says in Section 4

24   at page 7.

25        First Student had knowledge of DPS' unique

26   requirements for routing systems.

1          Okay  potential vendors of the systems to

2     three companies.  Bidders were required to set

3     up a routing system and include the price in

4     their daily rates.

5          Okay so she is saying that the DPS had unique

6     requirements for routing systems and she wasn't

7     able to get that information so she couldn't

8     submit, she couldn't submit a competent bid.

9          The problem with that is, Your Honor, I would

10    like you to please look at the first RFP which

11    you have in your hand on page 16 to 20 Your

12    Honor.

13          Do you see the heading, description   of

14    routing and scheduling software requirement?

15

16          THE COURT:  Yes.

17

18          MR. MASSAQUOI:  So at 18, 19, 20,

19    DPS lays out in detail all of the requirements

20    that it's asking its vendors to submit to the

21    DPS for its rounting system. I mean, they go on

22    for four single-spaced pages. All the details.

23

24          Now then of course we have, first of all we

25    have Safeway that says, well they didn't have

26    enough information about what they were supposed

1     to be providing to the DPS so they couldn't

2     possibly make a reasonable bid on the routing

3     system.

4

5          These kinds of things --

6

7          THE COURT:   How much time -- how

8     much more time do you need? You keep on making

9     reference to the document.   I stated at least 20

10    times I have read this stuff. I am not

11    admonishing you.

12

13         I  just want to make sure you

14    understand.

15

16         Oral argument is a limited period of time.

17    Assuming the judge has read everything, it is a

18    limited timeframe in which you folks can be

19    persuasive. You can try and be persuasive. You

20    either refer to a particular proposition you

21    have. It is not the time to go over everything

22    that's already been filed. I read it. When you

23    say Judge please look at here, please look at

24    there, I have indicated I have seen it. I want

25    you to tell me in a couple of sentences or a

26    paragraph why I should not grant injunctive

1       relief that they are seeking. After you're

2       done, you have to argue as well. So I want

3       something brief.

4

5           MR. MASSAQUOI:  Okay Your Honor, I will

6       do that. The only problem, that document was

7       never before Your Honor until this morning

8       that's why I went through it and I will cut it

9       short. I will do exactly what you said and  I

10      will cut through it.

11

12          If you look at these documents and even the

13      ones that were submitted today you will see for

14      example this is probably the centerpiece of the

15      plaintiff's case which we have not discussed

16      before because it was raised in their reply

17      brief and we didn't raise it before because we

18      didn't have a chance to.

19

20          They are saying that they  have attached this

21  ·    document, this transcript of this

22      surreptitiously obtained discussion and saying

23      that showed that information was passed on to

24      Mr. Grant and here is why it doesn't show that

25      and here's why Counsel has failed to understand.

26

1       That conversation happened in February and

2       it is very important to understand February of

3       2010. It is very important for the court to

4       understand the chronology and I would have to

5       show you one more thing on this second RFP so

6       the court will understand why.

7

8       These contracts provide specifically that

9       after the final people, companies  are awarded,

10      they can do further negotiations and this is --

11      these discussions were absolutely within the

12      rights of the party.

13

14      Your Honor, please indulge me this one thing.

15      Please look --

16

17              THE COURT:  I am getting old now. I

18      want to make sure you said one thing.

19

20              MR. MASSAQUOI:  This is very

21      important to my client and I just want to put --

22      I'm just trying  to put --

23

24              THE COURT:  I will give you the

25      unique attention I haven't given to anything

1   else because this one thing is going to be

2   the big thing.  Go ahead.

3

4               MR. MASSAQUOI:  One document.

5   Looking at this, please turn to page -- pages 12

6   and to page 14.

7               THE COURT:   What documents?

8

9               MR. MASSAQUOI:  Of the first RFP.

10               THE COURT:  All right.  I've got

11   it.

12

13               MR. MASSAQUOI:  Okay the first RFP

14   -- you see where it says number four, process

15   for the award. It says DPS will award and

16   negotiate a contract to the responsible SP,

17   service provider whose offer best meets the

18   district's needs. It says that the combined

19   relative merit of the evaluation  criteria

20   listed below will be used in the selection of

21   the VSP.  DPS reserves the right to seek

22   clarification of information submitted in

23   response to the DPS. Also reserves the right to

24   make award without further discussion.

25

26       Now , Your Hoor, please look at page 14.

1        You see where it says four, Tab B.  Okay

2        look at the second full paragraph.  It says,

3        acceptance of a proposal by the Detroit Public

4        Schools does not constitute a contract. A final

5        contract document will be subject to

6        negotiations and DPS will approve execution of a

7        contract. And it says while the financial

8        responsibility of the proposal is a significant

9        concern, DPS is equally concerned with the

10       proven ability et cetera. The point being here

11       that after the final -- the RFP-1

12       went out,, it was withdrawn, they then made

13       RFP-2. .  The two lowest bidders were ABC and

14       First Student and at that point the selection

15       had been made and then they were deciding

16       whether it would be just First Student or ABC

17       would be a contractor too.  They had every right

18       under the RFP-2 to negotiate with Mr. Grant of

19       ABC to get him to lower his price and when he

20       lowered his price equal to that of First

21       Student, he also got a part of the contract.

22       They had every right to do it. And, Your Honor,

23       these contracts are very complicated and they

24       are very detailed. They are absolutely fair to

25       all parties and I want also, Your Honor if the

1      court would look at the second part of the

2      second RFP,  page 9.

3

4              THE COURT:  The first one is that

5      the one you want me to pay attention to?

6

7              MR. MASSAQUOI:  Yes Sir.

8

9              THE COURT:  I will try to do it. I

10     am moving.

11

12             MR. MASSAQUOI:  No no, it's this

13     document. It should say December 16, 2009 in the

14     lower right-hand corner. It says Request for

15     Proposal.

16

17             THE COURT:   It looks like either A-

18     -

19             MR. MASSAQUOI:   It's an A.

20

21             THE COURT:   That's what you mean by

22     second?

23

24             MR. MASSAQUOI:   Yes, Your Honor.

25     That is the second Request for Proposal.

26

1        Ask the court to please turn to page 9.

2

3              THE COURT:   Yes.

4

5              MR. MASSAQUOI:   All right you see

6    where it says -- -- I am looking and it says 1,

7    2, 3.  It says the district may offer the

8    contract to one or more service providers.

9       So, the point is it doesn't have to take the

10   lowest bidder alone. After an award is made it

11   can take the two lowest bidders.    It provided

12   for that specifically in the RFP.   Mr. Jarrett

13   has just submitted that into evidence and he

14   agrees this is the second RFP. The DPS had every

15   right to offer a contract to both the lowest

16   bidder and the second lowest bidder and they

17   violated absolutely no rules in their own RFP

18   process.

19      Your Honor, I will cut the rest of this just

20   to say irreparable harm, I don't see what

21   irreparable harm the plaintiffs have shown in

22   this case at all. They went through a litany of

23   things. They say in paragraph 41 of their

24   complaint, they say things like the DPS will  be

25   obligated to  First Student for five to 10

26   years. But that's not irreparable harm. The

1       public will lose  Safeway as a student

2       transport service provider as if no other bus

3       company could possibly serve the public.

4

5            There will be loss of economy in the city of

6       Detroit.

7                 Not irreparable harm.

8

9            And we heard about all the other things and

10      then lastly, Ms. Payne is going to lose her job.

11      I am not trying to mock, but the point is that's

12      not irreparable harm. It is certainly not

13      irreparable harm to the public and I daresay

14      it's not irreparable harm to Ms. Payne.  People

15      lose their jobs every day. We all  know that in

16      Detroit. But public interest,  DPS is

17      hemorrhaging money as the affidavit of Mr.

18      Glaster points out, Your Honor. The DPS has a

19      $100 million annual budget deficit. Every year

20      it operates, it goes $100 million into the hole.

21      This one contract is saving the DPS $10 million

22      a year by awarding it to First Student.

23         The DPS has a $300 million debt and it's

24      facing receivership. Your Honor, the public --

25      the public has absolute interest in having a

26      viable  healthy, fiscally sound public school

1    system and if we pose a harm, we talked about

2    plaintiffs haven't even shown any harm much less

3    even the right to come here  and have standing.

4    The DPS is looking at this summer not having

5    contracts, not being able to move its 8000

6    summer school students, having to overturn this

7    entire applecart.

8         I think  they haven't made a showing on any

9    one of the four tests to show a right to

10   injunctive relief, Your Honor.

11        Thank you.

12

13             MR. CLEMMONS:  Very briefly, Your

14   Honor.

15

16             THE COURT:   You're going to learn

17   from the wisdom of the others?

18

19             MR. CLEMMONS:   I will be quick.

20

21   Detroit Public Schools will relay on the

22   argument of Defendant Bobb as set forth

23   independently.  We would speak only in addition

24   to the first factor with respect to the

25   issuance of injunction, that is, the likelihood

26   of plaintiffs prevailing on the merits

1

2          Just briefly, learned Counsel Jarrett  made

3      his argument on that point, he did not identify

4      any of the statutory exceptions to governmental

5      immunity which is provided to a governmental

6      entity like the DPS under 691.1401.

7          That broad grant of immunity came long after

8      the two cases which Mr. Jarrett cited from 1908,

9      1888 and the AmJur.  That immunity is to be

10     granted broadly, accepted narrowly and within

11     his pleading no exceptions are pleaded. He has a

12     duty to plead an avoidance. So we have complete

13     immunity as it pertains to Detroit Public

14     Schools and with respect to that particular

15     factor, since he cannot prevail on that one then

16     the injunction should be denied in total.

17                    THE COURT:   Anything else?

18                    MR. JARRETT:   May I respond,

19     Your Honor, briefly?

20                    THE COURT:  Yes. Now this will be

21     your last opportunity. You cited in your brief

22     and  started out in your brief  using the two

23     cases. The one I was looking at, the one I must

24     look at.   I asked you to go ahead and take a

25     look at those  now that you have had the

26     advantage of hearing the other side in terms of

1    their position and indicating their

2    positions.  They are showing you what they

3    allege to be weaknesses in your position. So you

4    may want to go oer these  briefly and the court

5    will then render its opinion.

6

7         MR. JARRETT:  Thank you Your Honor.

8    First of all, I don't know if Mr. Massaquoi

9    is really familiar with the governmental

10   immunity statute.  Mr. Clemmons  used to work in

11   my office. I know he is familiar with it. The

12   immunity statute has nothing at all to do with

13   these proceedings. It  grants immunity from tort

14   liability. We are not here seeking to sue on a

15   tort claim and we are not seeking money damages.

16   Mr. Bobb is not immune from anything which this

17   Court may exercise its equitable powers over and

18   Mr. Bobb is not -- contrary to Counsel's

19   statement, absolutely empowered to do anything

20   he wants. He grants -- he grants, his authority

21   is granted or is derived from the statute under

22   which the governor appointed him and because his

23   powers are statutorily derived, Your Honor, he

24   must do anything that he does with an ethical,

25   lawful and fair and with fairness as the

26   underlying principle in everything that he does.

1          Now Counsel cited that there is no

2     requirement that competitive bidding be -- that

3     services for public entities be for school

4     districts.

5

6          Counsel tried to suggest that it was related

7     only to the DPS.

8

9          School districts are not required to offer

10    contracts for competitive bidding when the

11    contracts relate to services. Mr. Massaquoi  is

12    correct about that but that doesn't mean that if

13    you opt to, if you elect to submit a particular

14    contract to competitive bidding that you can

15    thereafter operate the process in an unfair

16    manner. So the fact that he wouldn't have been

17    required to do competitive bidding doesn't mean

18    he can do competitive bidding in a selective

19    way.

20         Counsel also suggested that the First Student

21    report could have been obtained by FOIA. Well,

22    in fact that is how we got to the report. The

23    fact of the matter is at the time the bids were

24    being submitted and prepared, there were

25    deadlines and by withholding the report, they

26    withheld the information. Then when the final

1      request comes, of course, the school district

2      just turns it around the day after and sends it

3      out.  They have five days to respond and they

4      can extend it for an additional 10 days. It has

5      15 days before they're even late in  responding

6      and after that point you have exhausted much of

7      the time that is required for preparation.

8

9          So by withholding the information, there were

10     clearly things that First Student knew that the

11     other bidders did not know and could not take

12     into account. Similarly, I think the reference

13     to the routing system is misleading. First

14     Student knew there were three specific

15     manufacturers by manufacturer and routing number

16     and serial number that would work. So these

17     several pages of this is what you're looking for

18     in a routing system still doesn't define that

19     there are only three that will work for DPS and

20     therefore the other bus companies that were

21     bidding had to try to find the various different

22     models that would work under this description.

23     So that's really a red herring, Your Honor.

24

25         Responding to the court's inquiry, I believe

26     that when you have a tainted process, whether it

1        is statutorily required or not, when you

2        undertake to do it this way, you have to do it

3        fairly. Once you don't do it fairly, once there

4        is not an even playing field, it must be set

5        aside.

6

7            I think we have demonstrated that the process

8        was tainted from the beginning and it was

9        slanted from the beginning throughout and in

10       favor of First Student.

11

12           Mr. Grant himself said it. He was only

13       brought in as a token. Detroit-based company --

14       after the decision had already been made to

15       award the contract to  First Student.

16           I think that with respect to the plaintiffs

17       Counsel accuses me of not reading something. He

18       didn't read the first paragraph of the

19       complaint, the verified complaint signed under

20       oath by each of the plaintiffs.

21

22           The first paragraph of the verified complaint

23       identifies what the Detroit Board of Education

24       Advisory Council is, how it came to be and what

25       it does.

26           The second paragraph identifies Ms. Payne and

1    her standing  as a taxpayer both as a home

2    owner and an income tax payer.

3        The brief that I filed, the supplemental

4    brief that I filed a week and a half ago

5    addresses their standing, Your Honor. So the

6    fact that I didn't repeat it in this reply brief

7    doesn't mean that I didn't address it. The case

8    law that I cited in the initial brief makes it

9    clear that the competitive bidding process is a

10   process which is done in  favor of the public

11   and the individual taxpayers and it has standing

12   to challenge it and frankly, I think to suggest

13   that people lose their jobs every day, that's

14   true. It is something I acknowledge in my reply

15   brief. But when you lose your job to a tainted

16   bid process when those who would undertake it

17   had an obligation ethical and legal obligation

18   to do it in a fair manner, then you have

19   standing to complain. Not just Ms. Payne but all

20   of the bus drivers who are about to lose their

21   jobs.

22       And finally, Your Honor, and I do believe I

23   mean the real finally.

24       Counsel  suggests that there is a difference

25   between five month access and  five week access

26   and I have to concede there is. And there was --

1    I wasn't misinformed. It was just an error on

2    my part when I drafted the complaint which I

3    brought to your attention  last week and at the

4    beginning of proceedings this morning. Five

5    weeks access  of one company to the exclusion of

6    any access to any other company is clearly one-

7    sided and the fact of the matter is Safeway has

8    provided services for 35 years but never had

9    such access. They executed the plan that DPS

10   created  internally. They did the assignment

11   given to them . They didn't suggest changes.

12   They weren't asked their opinions. They never

13   inspected anything so their execution of the

14   DPS-created operational plan over 35 years

15   doesn't give them the information that Safeway

16   had -- excuse me, that First Student had in five

17   weeks and that is unprecedented access. It would

18   not even be fully  reflected in the report even

19   if the report had been handed to all of the

20   bidders initially.

21               THE COURT:    All right folks,  the

22   court is ready to render its opinion and I will

23   be addressing it to the lawyers but obviously to

24   you in the audience deserve to also be aware of

25   what it is.

26               RULING OF THE COURT

1       The issue is a big issue and I will it

2       obviously impacts on all of our lives one way or

3       another.

4       The case before me now is essentially one of

5       injunctive relief on  and t is not a final

6       determination on the merits of the case.

7

8       The decision today will be presented based upon

9       the evidence presented to me, the arguments

10      presented to me and the legal support thereof.

11      `

12      It will also consider obviously the fact that

13      certain evidence has  not been presented or is

14      lacking or is not sufficient.

15

16      There at this  point has not been -- and I

17      assume the parties are ready for my decision, am

18      I correct?

19              (Agreement by all counsel)

20              THE COURT:  There has not been at this

21          point the following with the exception of the

22          documents that were given to me this morning

23          and I reviewed them sufficiently to make my

24          call.  There has been no other request to

25          supplement, no other request to receive  any

26          other evidence there has been no request to

1        adjourn.   In fact the parties have just

2        indicated to me that they are prepared to

3        have the court render its opinion and I will

4        do so.

5

6        I will do so having considered everything.   I

7        will do so having listened to the lawyers.

8        I don't want anything reflected in the

9        perception here that because I have asked

10       lawyers to speed it up that I am somehow rushing

11       to judgment. That is not the issue. The lawyers,

12       respectfully, lawyers will argue as long as you

13       let them. But the length of the argument does

14       not mean that those positions justify what they

15       are asking for. And so that's why as you will

16       recall when the case was first called before me,

17       I told the lawyers, these are the cases that I

18       am looking at. These are the elements I am

19       looking at.  And my suggestion:  Give me what

20       you think I need to make the call.  From that

21       particular standpoint, the court is proceeding.

22

23       I will not be addressing everything that was

24       brought to my attention during the argument, I

25       will not be addressing, for example, the issue

26       of standing, I will not be addressing the issue

1    of governmental immunity. There are

2    obviously other pending lawsuits involved in

3    this matter  that have been brought to my

4    attention and quite frankly there are issues

5    that are much much bigger than what's on my

6    plate today. And so my call is a narrow one.

7        The objective of a preliminary injunction is

8    to  maintain the status quo pending a final

9    hearing regarding the rights of the parties.

10   Fancy vs. Egrin, 177 Mich App 714 .

11       MR. JARRETT:   Could the court repeat the

12   cite? I am sorry.

13

14       THE COURT:   I will  start over again. I used

15   it before. I don't know if you were before me or

16   not. I will start all over again.

17

18       MR. JARRETT:   I understand.  I cited the

19   case in my brief.

20       THE COURT:   You sure did.

21       A preliminary injunction may be ordered if

22   the court considers the following:

23       1.  The  likelihood that the  party

24   seeking the injunction will prevail on the

25   merits.

26       2.  The danger that the  party seeking

1    the injunction will suffer irreparable harm

2    if the injunction is not issued.

3         3.  The risk that the party seeking the

4    injunction would be harmed more by the absence

5    of an injunction than the opposing party would

6    be by the granting of relief.

7         4.  And finally, the  harm to the

8    public if the injunction is issued.

9    As you recall, Mr. Jarrett, I also cited

10   Alliance for the Mentally Ill vs. Department of

11   Mental Health 231 Mich App 647.

12   Plaintiff suggests they will suffer the

13   following harm if an injunction is not issued.

14        1. The operation of the transportation

15   by First Student which plaintiff claims has a

16   history of safety violations.

17        2.  Being contractually obligated to

18   First Student without corresponding financial

19   benefits.

20        3.  Loss of Safeway as a transportation

21   provider.

22        4. The perversion of the bid process.

23        5.  The loss of economy within  the City

24   of Detroit.

25        6.  The  loss of employment with respect

26   to the plaintiff Payne.

1       The safety of schoolchildren is of course

2   of paramount importance to the court and to

3   everyone else.

4       Plaintiff's complaint lists various

5   allegations  of safety violations involving

6   First Student spanning several years. However,

7   the court cannot issue a TRO on the basis of

8   mere allegations alone.

9       Here plaintiffs have not presented credible

10  evidence that establishes or verifies current

11  safety violations that pose a direct threat to

12  Detroit schoolchildren.

13      Moving on to plaintiff's claim that

14  irreparable harm will result if DPS becomes

15  contractually obligated to First Student. The

16  court notes that defendants have submitted

17  substantial evidence regarding the financial

18  benefit of the contract with First Student.

19  Plaintiffs have not submitted any evidence in

20  support of their claim that the contract with

21  First Student would not be financially

22  beneficial. Similarly plaintiffs have not

23  submitted evidence that Safeway is

24  overwhelmingly superior to First Student such

25  that the services contract constitutes

26  irreparable harm.

1          With respect to plaintiff's allegations

2     regarding the unfair bidding process,

3     plaintiff's complaint states that the RFP

4     process and the  defendants manipulated thereof

5     was improper, unlawful and fundamentally unfair.

6          In support of the general claim, plaintiffs

7     have submitted the affidavit of Patricia

8     Whitlow, the president of Safeway but the

9     relevant portions of that affidavit are

10    inadmissible.  First, large portions of the

11    affidavit are hearsay or  merely stating what

12    she heard from other various sources

13         We should say Whitlow's affidavit includes

14    references to a telephone conversation with

15    Charlie Grant, owner of ABC and another bidder.

16    There is no indication that Whitlow recorded

17    conversation with Grant's  consent.

18         Recording a conversation without the consent

19    of another party is in violation of MCL 750.530

20    (9)(c).

21         In addition, the court has already cited two

22    cases for the proposition that it's illegal.

23    Actually I cited one case and that was the

24    People versus Stone.  I gave you two cites.  The

25    Court of Appeals cite and the Michigan Supreme

26    Court cite.

1      Certain portions of the affidavit are not

2  based on personal knowledge but instead mere

3  speculation.

4      For example in paragraph 7  Whitlow admits

5  she had not seen the First Student bid  she

6  "doubts" it was $5 million  less than Safeway.

7  Plaintiff suggests that awarding the  contract

8  to First Student would result in irreparable

9  harm to plaintiff; to the Detroit economy.  .

10  Plaintiff has failed to elaborate on the claim

11  but economic injuries are  not irreparable

12  because they can be remedied by the under-cited

13  law.  Thermatool  Corporation versus Borzym  227

14  Mich App 366.

15      Finally plaintiff argued that Barbara Payne

16  will suffer irreparable harm, she will lose her

17  job at Safeway. The loss of job constitutes

18  economic harm.

19      Again economic injuries are not irreparable

20  because they can be remedied at law.    Again,

21  Thermatool Corporation Inc.

22      For the reasons stated above, plaintiff has

23  failed to establish irreparable harm. Plaintiffs

24  have also failed to demonstrate likelihood of

25  success on the merits. As the defendants point

26  out, plaintiff's complaint does not state any

85

1    specific claim of defendants based on the

2    alleged improper bidding process. The

3    plaintiff's only specific claim is for

4    injunctive relief however as previously stated,

5    plaintiffs have  not established irreparable

6    harm and therefore have not demonstrated

7    likelihood of success on the request for

8    injunctive relief.

9       The risk of harm to the plaintiff  if  an

10   injunction is not entered is equal to the harm

11   defendants will suffer if the request for

12   injunction is granted. Both sides have  issues

13   here at stake. Plaintiffs have jobs of Safeway

14   at issue while the defendants are attempting to

15   reduce the staggering debt of the Detroit Public

16   School system.

17      With respect to the harm to the public

18   interest if an injunction is issued, the

19   defendants have presented evidence that the

20   public has an interest in reducing the cost of

21   the DPS. Defendants have demonstrated that the

22   First Student contract will result in

23   significant savings to DPS and have therefore

24   made a strong argument that granting injunctive

25   relief will harm the general public.

26      Based on that, gentlemen, the request for

1    injunctive relief is hereby denied. Thank you

2    gentlemen.

3         MR. MASSAQUOI:  Judge shall we prepare

4    an order or just say, 'for reasons stated in the

5    record'?

6         THE COURT:   I can give you a blank form

7    now or if you wish you can prepare an order.

8    It's up to you.  Do you want a blank order form

9    now?

10         MR. MASSAQUOI:   I would rather work it

11   out.  We will work it out.

12         THE COURT:   Make sure it is reflective

13   of the court's ruling. All right take care.

14

```
 1   STATE OF MICHIGAN      )
 2
 3   COUNTY OF WAYNE        )
 4
 5               C E R T I F I C A T E
 6
 7
 8       I, KATHLEEN MAXWELL,
 9
10   Official Court Reporter of the Third Judicial
11
12   Circuit Court, do hereby certify that the
13
14   foregoing pages all inclusive, comprise a
15
16   true, correct and complete transcript of the
17
18   proceedings in the matter of
19
20
21   DETROIT BOARD OF EDUCATION ADVISORY COUNCIL
22
23   -VS- ROBERT BOBB, ET AL
24
25   TUESDAY, MARCH 30, 2010.
26
27
28
29
30   FRIDAY, FEBRUARY 26, 2010
31
32
33
34          Kathleen L. Maxwell, CSMR/CSR 0010
35          Official Reporter Third Circuit
36          921 CAYMC Building
37          Detroit, Michigan, 48226
```

87

```
 1   STATE OF MICHIGAN      )
 2
 3   COUNTY OF WAYNE        )
 4
 5              C E R T I F I C A T E
 6
 7
 8      I, KATHLEEN MAXWELL,
 9
10   Official Court Reporter of the Third Judicial
11
12   Circuit Court, do hereby certify that the
13
14   foregoing pages all inclusive, comprise a
15
16   true, correct and complete transcript of the
17
18   proceedings in the matter of
19
20
21   DETROIT BOARD OF EDUCATION ADVISORY COUNCIL
22
23   -VS- ROBERT BOBB, ET AL
24
25   TUESDAY, MARCH 30, 2010.
26
27
28
29
30   FRIDAY, FEBRUARY 26, 2010
31
32
33          Kathleen Maxwell
34          Kathleen L. Maxwell, CSMR/CSR 0010
35          Official Reporter Third Circuit
36          921 CAYMC Building
37          Detroit, Michigan, 48226
```